CAMPBELL *et al.* v. THE CITY OF KANSAS, *Appellant.*

1. **Judgment**: ESTOPPEL. A judgment cannot be invoked as an estoppel unless pleaded.

2. **Land, Dedication of to Public Use**: DEED OR WRITING UNNECESSARY. The actual use of land may be devoted by its owners to public purposes without a deed or writing of any character.

3. ———: ACTS IN PAIS. Proof of such devotion may consist of acts *in pais* going to show that the owners intended to donate the use for a public purpose, and that the public accepted it and used it for that purpose.

4. ———: ———: LEGAL TITLE. The estate so parted with does not extend beyond the use of the land, leaving the technical legal fee in the donors which, however, must be held by them for the donated use as long as that use continues.

5. ———: ———. A square was marked "donated for graveyard" on an original plat not signed or acknowledged by the proprietors of the town site, but was filed with the recorder of titles by one of them who soon after used it at a public sale of lots. The plat and the use of the land for interments were acquiesced in by the proprietors. *Held* a sufficient evidence of a dedication *in pais*.

6. ———: DONEE'S RIGHT OF EXCLUSIVE POSSESSION. The donors of land dedicated to a city for a cemetery have, while the public use lasts, no right to a concurrent possession subject to a reasonable use by the public and cannot maintain ejectment against the city to recover such possession.

7. ———: DIVERSION OF USE: REVERTER. Land dedicated to a city for a cemetery which has no longer the character and name of a graveyard, but is used as a public park, reverts to the donor, who may recover in ejectment against the city, which in its answer denies the abandonment and expressly alleges the continuation of the use.

8. ———: ———: CY PRES. The question will not be considered in such case whether the land can be appropriated and used for other charitable purposes germane to the original one, in accordance with the equitable doctrine of *cy pres*.

9. ———: ABANDONMENT OF A GRAVEYARD, WHAT CONSTITUTES. Land donated for a graveyard may contain the remains of the dead and yet be abandoned by the donee. Where no interments have for a long time been made, and cannot be made in such land, and in

Campbell v. The City of Kansas.

addition thereto the public and those interested in its use have failed to keep and preserve it as a resting place for the dead and have permitted it to be thrown out to the commons, and the graves to be worn away, gravestones and monuments to be destroyed, and the graves to lose their identity, and it has been so treated or neglected by the public as to entirely lose its identity as a graveyard and is no longer known, recognized and respected as such by the public, such facts constitute an abandonment of its use as a graveyard,

10. ——— : ———. So the land will be deemed abandoned as a graveyard if the public and those interested in its use as such have permanently appropriated it to a use entirely inconsistent with its use as a graveyard, and it has become impossible to use it for that purpose.

11. ——— : POLICE POWERS OF CITIES : GRAVEYARDS. The power given to a city in its charter " to make regulations to secure the general health of the inhabitants and prevent and remove nuisances," has been usually accepted as a sufficient grant of police power to authorize the prohibition of burials and the discontinuance of graveyards in the populous districts of cities.

12. The Evidence in this case examined and found to afford substantial proof of abandonment as set up in plaintiffs' replication.

*Appeal from Johnson Circuit Court.*—HON. N. M. GIVAN, Judge.

AFFIRMED.

*W. J. Ward* for appellant.

(1) To recover in ejectment the plaintiffs must have an absolute right of possession as against the whole world. (2) Defendant's first instruction should have been given, because the undisputed testimony showed that a large number of people had been buried in the ground in controversy, and that the larger part of them are buried there yet, and that all of them had been buried in the square in controversy after it had been expressly dedicated by its owners for the purposes of a graveyard. *Stockton v. City of Newark*, 9 Atl. Rep. 203; *Hunter v. Trustees*, 6 Hill ( N. Y.) 407; *Boyce v.*

*Kalbaugh*, 47 Md. 334; *Trustees v. Walsh*, 57 Ill. 363; *Brendall. v. Ref. Con.*, 33 Pa. St. 415. (3) Defendant's first instruction should have been given as the evidence showed a dedication forever as against the original proprietors and those claiming under them. *Bayard v. Hargrove*, 45 Ga. 342; *Mayor v. Franklin*, 12 Ga. 239; *Leffler v. City of Burlington*, 18 Iowa, 361; *City of Dubuque v. Maloney*, 9 Iowa, 450; *Wyman v. Mayor*, 11 Wend. 486; *Alton v. Transportation Co.*, 12 Ill. 38; *Carter v. City of Portland*, 4 Oregon, 339. (4) If the city has violated the purpose for which the land was dedicated the remedy is in equity to restore it to its proper use. The city cannot sue for its recovery. *Barclay v. Howell*, 6 Pet. 498; *Carter v. City*, 4 Oregon, 439. (5) The land being dedicated for a graveyard the only right the city could have was to regulate its use; it could not destroy it as a graveyard either by selling it or using it for other public purposes; and only having the right to control it for the purposes for which it was given, it could not deprive the citizens of the right to hold it as a graveyard, and defendant's second instruction should have been given. *Price v. Thompson*, 48 Mo. 361; *Stockton v. City of Newark*, 9 Atl. Rep. 203; *Commonwealth v. Rush*, 14 Pa. St. 186; *Warren v. Mayor*, 22 Iowa, 351; *Le Clercq v. Trustees*, 7 Ohio, 218; *Hunter v. Trustees*, 6 Hill, 407. (6) Defendant's third instruction should have been given for the reasons last above given. (7) Defendant's fourth instruction should have been given. *Stockton v. City*, 9 Atl. Rep. 203; *Hunter v. Sandy Hill*, 6 Hill (N. Y.) 407; *Boyce v. Kalbaugh*, 47 Md. 334; *Trustees v. Walsh*, 57 Ill. 363; *Brendall v. Ref. Con.*, 33 Pa. St. 415; *Louisville v. Nevin*, 10 Bush. 549; *State v. Wilson*, 94 N. C. 1015; R. S. 1879, sec. 1573. (8) Defendant's fifth instruction should have been given. (9) Defendant's sixth instruction should have been given. *Hunter v. Sandy Hill*, 6 Hill, 407. As to what constitutes a dedication see

*Price v. Breckenridge*, 92 Mo. 378 ; *Price v. Brecken-
ridge*, 77 Mo. 447 ; *Cincinnati v. Lessee of White*, 6
Pet. 431 ; *Mayor v. Franklin*, 12 Ga. 239 ; *Dubuque v.
Maloney*, 9 Iowa, 450 ; *Bayard v. Hargrove*, 45 Ga.
342 ; *Carter v. City of Portland*, 4 Oregon, 339 ; *City
of Alton v. Trans. Co.*, 12 Ill. 38 ; *Bartlett v. Bangor*,
67 Me. 460. ( 10 ) People being buried in this ground
under the dedication as made, their remains have a
right to remain there forever as against the plaintiffs ;
and defendant's sixth instruction should have been
given. *Stockton v. City of Newark*, 9 Atl. Rep. 203 ;
*Brendall v. Ref. Con.*, 33 Pa. St. 415 ; *Trustees v.
Walsh*, 57 Ill. 363 ; *Mayor v. Franklin*, 12 Ga. 239 ;
*Wyman v. Mayor*, 11 Wend. 486 ; *Bayard v. Hargrove*,
45 Ga. 342 ; *City of Alton v. Trans. Co.*, 12 Ill. 38 ;
*City of Dubuque v. Maloney*, 9 Iowa, 450 ; *Leffler v.
Burlington*, 18 Iowa, 361.

*C. O. Tichenor* also for appellant.

( 1 ) The dedication was sufficient. *Gridley v.
Hopkins*, 84 Ill. 534 ; *Smith v. Town*, 64 Ill. 96 ; *Rowan
v. Town*, 8 B. Monroe, 234 ; *Kainie v. Harty*, 73 Mo. 316 ;
*Trustees v. Walsh*, 57 Ill. 368. Mere acquiescence for
twenty years unaccompanied by any act which repels the
presumption of such intention to dedicate is conclusive
evidence of abandonment to the public. *Wood v. Hard*,
34 N. J. L. 91. ( 2 ) Courts have everywhere regarded
with favor the repose of the dead. They have been
careful to secure their sleep from disturbance. *Com-
missioners v. Church*, 30 Kan. 620 ; *Seymour v. Page*,
39 Conn. 653 ; *Swasey v. American*, 57 Me. 524 ;
*Dexter v. Gardener*, 7 Allen, 247 ; 2 Perry on Trusts,
sec. 706 ; *Meagher v. Driscoll*, 99 Mass. 284 ; *Pierce v.
Swan*, 10 R. I. 227 ; *Patterson v. Patterson*, 59 N. Y.
585 ; *Reg. v. Stewart*, 12 Ad. & El. 773 ; *Weed v.
Walker*, 130 Mass. 422 ; *Thompson v. Hicky*, 59 How.
434 ; *Kavan's Case*, 1 Me. 205. ( 3 ) The graveyard was

an appurtenance of value to purchasers of lots in the addition. *Abbott v. Mills*, 3 Vt. 527 ; 8 B. Mon. 235 ; *Grogan v. Town, etc.*, 6 Sawyer, 498 ; *Davidson v. Reed*, 111 Ill. 167. ( 4 ) The evidence does not show an abandonment of the land as a graveyard. *Seymour v. Page*, 33 Conn. 65 ; *Lake View v. Rose Hill*, 70 Ill. 195.

*Scarritt & Scarritt* and *Gates & Wallace* for respondents.

( 1 ) It is admitted that the original owners of the ground in controversy never signed or acknowledged the map or plat of 1847, upon which " Land 21 "( the ground in controversy ) appears as being marked, "Donated for graveyard." The legal title, therefore, of said land remained in said owners, and the dedication, if any, grew out of the use of said ground by the public as a burying ground. In order to constitute a statutory dedication and pass the fee to the county, the requirements of the statute must be strictly complied with. R. S. 1845, p. 1056, sec. 6 ; R. S. 1855, p. 1536 ; *United States v. Railroad*, 2 Biss. 177 ; *Banks v. Ogden*, 2 Wall. 68 ; *People v. Beaulein*, 2 Doug. ( Mich.) 270 ; *Lessees v. Mehrenf'd*, 8 Ohio St. 444 ; *Reid v. Board, etc.*, 73 Mo. 304 ; *City v. Stookey*, 23 Ill. 442 ; *Baker v. City*, 8 Minn. 491 ; *Putnam v. Walker*, 37 Mo. 600 ; *Emmons v. City*, 32 Wis. 434. ( 2 ) An owner of land, who dedicates or donates the same to the public for a specific use, has the right of possession to such property, and the right to use the same in any manner not inconsistent with the public use or purpose for which it was dedicated. Therefore, the plaintiffs in this suit holding, as it is admitted they do, the legal title to the ground in dispute, have a right to the possession of the same, subject to the use, even though it should be admitted that the use for which it was dedicated is still in effect and full force. And the action of ejectment against one who

holds the exclusive possession of the property, as the city does in this case, is the proper remedy. *Gidney v. Earle*, 12 Wend. 98 ; *Hancock v. Wentworth*, 5 Met. 446 ; *Robbins v. Borman*, 1 Pick. 122 ; *Harris v. Elliott*, 10 Pet. 55 ; *Alden v. Murdock*, 13 Mass. 255 ; *Crain v. Fox*, 16 Barb. 184 ; *Jackson v. Hathaway*, 15 Johns. 452 ; *Pomeroy v. Mills*, 3 Vt. 279 ; *San Francisco v. Calderwood*, 31 Cal. 587 ; *Armstrong v. City*, 69 Mo. 309 ; *Lawe v. City*, 35 N. W. Rep. ( Wis.) 563. ( 3 ) The jury in this case found, as a fact, under proper instructions, that the ground in controversy had been abandoned as a graveyard by the public, and those interested in its use as such, and that it had been put to other and entirely different uses ; and that the city had entered upon and was and is holding the exclusive possession thereof ; denying the right of possession to these plaintiffs who hold the legal title, and also denying the right of the public to use the ground as a graveyard by the passage of laws prohibiting its use for that purpose. The use for which the ground was dedicated having been abandoned by the public, and the city ( whose claim to possession has no more force than that of any other stranger to the title ) being in exclusive possession of the property, the right of plaintiffs to a judgment for possession is absolute and complete. And the instructions given by the court, of its own motion, defining abandonment, are in harmony with and fully supported by the authorities. *Price v. Thompson*, 48 Mo. 365 ; *Warrer v. Mayor*, 22 Ia. 351 ; *Commonwealth v. Bowman*, 3 Barr. ( Pa. ) 206 ; *Still v. Trustees*, 16 Barb. 107 ; *Cincinnati v. White's Lessees*, 6 Pet. 187 ; Wash. on Eas. [ 2 Ed.] 178 ; *McWilliams v. Morgan*, 61 Ill. 89 ; *Trustees v. Council*, 33 N. J. L. 19 ; *Board v. Edson*, 18 Oh. St. 226 ; *Carter v. City*, 4 Or. 348. ( 4 ) Referring to claim of defendant that land in dispute must remain forever subject to the use for which it was dedicated, notwithstanding the abandonment. *Appeal of Gumbert*, 1 Atl. Rep. ( Pa.) 438 ; 110 Pa. St. 496 ; *Society*

*v. Dugan*, 5 A. R. (Md.) 420; 65 Md. 460; *Reed v. Stouffer*, 56 Md. 254; *Schlessinger v. Mallard*, 11 Pac. Rep. (Cal.) 728; 70 Cal. 326; *Weisenberg v. Truman*, 58 Cal. 63; *Mayor v. Stockton*, 14 A. R. (N. J.) 630; *Craig v. Church*, 88 Pa. St. 42; *Kincaid's Appeal*, 66 Pa. St. 411. (5) Ejectment is the proper remedy in this case. *Jones v. DeLassus*, 84 Mo. 541; *Gardiner v. Tisdale*, 2 Wis. 153; *Tillmes v. Marsh*, 67 Pa. St. 512; *Morgan v. Moore*, 3 Gray, 319; *Gidney v. Earle*, 12 Wend. 98; *Hancock v. Wentworth*, 5 Metc. 446; *Robbins v. Borman*, 1 Pick. 122; *Pomeroy v. Mills*, 3 Vt. 279; *Perley v. Chandler*, 6 Mass. 456. (6) Defendant's possession is such as will enable plaintiffs to maintain ejectment. *Anderson v. City*, 47 Mo. 486; *Hammerslough v. City*, 57 Mo. 221; *Armstrong v. City*, 69 Mo. 311. (7) Defendant had authority to "vacate" the land in dispute as a graveyard, and prohibit further burials thereon and remove the graves as it did, and perform other similar acts, in the exercise of its police powers. Sess. Acts. 1852-3, p. 244; Sess. Acts. 1850-1, p. 91; *City of Charleston v. Church*, 4 Strob. (S. C.) 306; *Church v. New York*, 5 Cowen, 538; *Mayor v. Slack*, 3 Wheeler's Crim. Cas. 256; 1 Dillon on Mun. Corp. [3 Ed.] sec. 372; *Coates v. Mayor*, 7 Cowen, 585; *Bailey v. Culver*, 84 Mo. 531. (8) The sale of lots by the owners thereof referring to map of 1847 for descriptions did not pass the title to the land in dispute to the purchasers, as claimed by the defendant. *Becker v. City*, 37 Mo. 19; *Pierce v. Chamberlain*, 82 Mo. 618; *Bailey v. Culver*, 12 Mo. App. 184; *Bailey v. Culver*, 84 Mo. 538; *Rude v. City*, 93 Mo. 408; *People v. Beaulien*, 2 Doug. (Mich.) 270; *Price v. Thompson*, 48 Mo. 363. (9) The answer in the case of *Grant v. The City of Kansas* was properly admitted in evidence. *Landis v. Hamilton*, 77 Mo. 554; 1 Greenl. on Ev., sec. 527 *a*; Whart. Ev., secs. 836, 838, 1110, 1116, and 1185; *Fruby v. Seyburt*, 12 Penn. St. 101; *Warfield v. Lindell*, 30 Mo. 272; *Ayers v. Ins. Co.*, 17 Iowa,

176 ; *Baum v. Fryrear*, 85 Mo. 151 ; *Parsons v. Cope-land*, 33 Me. 370 ; *Bliss v. Nichols*, 12 Allen, 443. (10) The published proceedings of the council being the best evidence obtainable was properly admitted in evidence. Sess. Acts. 1850–1, p. 95, sec. 3 ; Sess. Acts. 1859, p. 210, sec. 11 ; *McConey v. Wallace*, 22 Mo. App. 377 ; *Adis v. Graham*, 88 Mo. 197 ; *Smith v. Lindsay*, 89 Mo. 76. (11) The action of the court in excluding the testimony of P. S. Brown, as to the alleged conveyance of the interest of the Jobes to W. C. Scarritt, was proper. Whart. Ev., secs. 150, 147 and 145 ; *Carr v. Carr*, 36 Mo. 408 ; *Christy v. Kavanaugh*, 45 Mo. 376 ; *Blondeau v. Sheridan*, 81 Mo. 545 ; *Farrell v. Brennan*, 32 Mo. 328 ; *Price v. Hunt*, 59 Mo. 258; Greenl. Ev. [ Redf. Ed ] sec. 82 ; *Smith v. Phelps*, 74 Mo. 598 ; R. S. 1879, sec. 3671. (12) Other objections to testimony are frivolous and immaterial.

*Noble & Orrick* and *H. A. Loevy* for respondents, Gantt and Ranken.

(1) There was simply a common-law, not a statutory, dedication ; consequently the right to possession and use only, and not the fee simple, passed out of the grantors. R. S. Mo. 1845, p. 1056 ; *Rutherford v. Taylor*, 38 Mo. 319. The plat under which the dedication is claimed was not signed by any of the twelve original proprietors of Land 21. (2) The easement granted by the dedication was that of possession and use for a graveyard only. The public acquired only the right to bury the dead in the land set apart, and no other right or title whatsoever. The words which evidence the donation are, "Donated for a graveyard," which are written on a plat of the land. (3) The land could not lawfully be used for any other purpose than that of a burying ground, the right being construed very strictly. *Becker v. St. Charles*, 37 Mo. 13 ; *Still v. Trustees*, 16 Barb. (N. Y.) 110 ; *Price v. Thompson*, 48 Mo. 365–6 ;

*Ransom v. Boal*, 29 Iowa, 68; Washb. on Eas. & Serv. 211, 254, 255; on 257, sec. 7; on 263, sec. 13; on 653, sec. 1266; *County of Harris v. Taylor*, 58 Texas, 690; *Rex v. Pratt*, 4 E. & B. 860; *Ballard v. Dyson*, 17 Taunt. 279; Gale & Whateley on Easm. [Ed. 1840] pp. 237, 238. (4) The right granted was usufructuary, not perpetual, and continued only while the land was being used as a cemetery. *Weisenberg v. Truman*, 58 Cal. 71–2; *Kincaid's Appeal*, 66 Pa. St. 411; *Windt v. Church*, 4 Sandf. Ch. 474; *Richards v. Church*, 32 Barb. 42; *Price v. Church*, 4 Ohio, 515; *Gilbert v. Buzzard*, 3 Phill. Ecc. R. 337; 1 Washburn R. Prop. [5 Ed.] p. 35; *Sohier v. Church*, 109 Mass. 21; *Partridge v. Church*, 39 Md. 631; *Smith v. Thompson*, 55 Md. 5; *Page v. Symonds*, 63 N. H. 19; *Foster v. Dodd*, 17 L. T. R. 614; s. c., 3 L. R. Q. B. 67; 8 B. & S. 842, and 37 L. J. N. S. 28. The right could lawfully be extinguished against the will of the public and of those interested in the bodies interred there. *First.* By the legislature and necessarily the city council of Kansas City. *Hancock v. Wentworth*, 5 Metc. 451; Washb. Eas. & Serv. 655, sec. 6; 2 Hilliard Real Prop. 3, sec. 12; *State v. Culver*, 65 Mo. 609; Cooley, Con. Lim. 595; *Craig v. Church*, 88 Pa. St. 42; *In re Burial Grounds*, L. R. 3 Eq. 172; *Mussey v. Proprietors*, 41 Me. 38; *Gebhardt v. Reeves*, 75 Ill. 306. *Second.* By decree of a court of law. *Partridge v. Church*, 39 Md. 631. *Third.* By the course of nature, in its effects upon the remains interred and upon the external evidences of a graveyard. *Trustees v. Sandy Hill*, 6 Hill (N. Y.) 411. (5) An easement can be lost or extinguished by the grantee. *First.* By voluntary relinquishment. Angell on Highw., secs. 132 (and cases cited with approval in *Becker v. St. Charles*, 37 Mo. 19) and 168; *In re John and Cherry Streets*, 19 Wendell, 676; 3 Kent, Com., p. 432, note "d" and cases; Washb. Eas. & Serv. 20, 638; *Whitbeck v. Cook*, 15 Johns. 483; *Cheshire v. Stevens*, 10 N. H. 137; *Lackland v. Railroad*, 31 Mo. 187; *West*

*Covington v. Freaking,* 8 Bush, 128; *Halderman v. Railroad,* 50 Pa. St. 436; *Brooks v. Riding,* 46 Ind. 19; *Stackpole v. Healy,* 16 Mass. 36. *Second.* By voluntary non-user of the land for the purposes of the dedication. *State v. Culver,* 65 Mo. 609; *Knight v. Heaton,* 22 Vt. 483; *Fox v. Hart,* 11 Ohio, 416; *Peoria v. Johnston,* 56 Ill. 51; *Winham v. McGuire,* 51 Ga. 582; Washb. Eas. & Serv., p. 155; *Callaway County v. Nolley,* 31 Mo. 393; L. R. 2 Ch. App. 478. *Third.* By voluntary diversion from the purpose of the dedication ( change from grave-yard to park and place of public amusement ). *Crain v. Fox,* 16 Barb. ( N. Y.) 186; *Beach v. Haynes,* 12 Vt. 20; *Rutherford v. Taylor,* 38 Mo. 318; Angell on Highw., sec. 167; *Jacksonville v. Railroad,* 67 Ill. 543; *Hamphill v. Boston,* 8 Cush. 195; s. c., 54 Am. Dec. 750, *et seq.;* Dillon Mun. Corp. [ 3 Ed.] p. 583, sec. 589. *Fourth.* By estoppel through acquiescence in admissions of record made and ordinances passed by the defendant. *Fifth.* By voluntary abandonment. 2 Washb. Real Prop., p. 82, *et seq.;* [ 3 Ed.] p. 340; *Winham v. McGuire,* 51 Ga. 582; *Hooker v. Co.,* 12 Wendell, 373; *Whitbeck v. Cook,* 15 Johns. 483; *Cheshire v. Stevens,* 10 N. H. 137; *Lackland v. Railroad,* 31 Mo. 187; *Heard v. Brooklyn,* 60 N. Y. 248. *Sixth.* By destruction or change or alteration of the dominant estate. *Ballard v. Butler,* 30 Me. 98; *Morrison v. Marquardt,* 24 Iowa, 68; Gale & Whateley Eas., pp. 239, 258, 262; *Dyer v. Sanford,* 9 Metc. ( Mass.) 401, cited and approved Washb. E. & S., p. 668, sec. 15; Best on Presumptions, p. 95, sec. 105; Washb. Eas. 656, sec. 9; 679, sec. 1. *Seventh.* By the revocation of the dedication by the grantors after the use had been abandoned. *Rutherford v. Taylor,* 38 Mo. 318; Angell on Highw., sec. 167. *Eighth.* By impossibility of further use for the purposes of the ded-ication. 4 Hurlst and N. 19; 4 Cush. 152; 3 Vermont, 526; Washb. Eas. & Serv. 654, sec. 3; Dillon, Mun.Corp. sec. 515 and cases cited ( especially 18 Ohio St. 221 and 10 Peters ( U. S.) 25 ), also p. 650 [ 3 Ed.]; *Commissioners*

*v. Armstrong*, 45 N. Y. 234; *Venable v. Coffman*, 2 West Va. 310; *Board v. Edson*, 18 Ohio St. 221; *Webb v. Moler*, 8 Ohio, 552. If extinguished for a moment it was extinguished forever. Upon the loss of the easement, the donors' right to the possession of the land which had been dormant reverted to the donors or their successors in blood or estate. *Rutherford v. Taylor*, 38 Mo. 319; *Trenor v. Jackson*, 46 How. Pr. 397; *Commissioners v. Armstrong*, 45 N. Y. 243; *Still v. Trustees*, 16 Barb. (N. Y.) 107; Cooley Const. Lim., sec. 558; *Venable v. Coffman*, 2 West Va. 310; *Hayward v. New York*, 7 N. Y. 314; *Hastings v. Railroad*, 38 Iowa, 316; Mills Em. Dom., sec. 57. And they are entitled to recover in ejectment. (6) The City of Kansas as a municipal corporation and its officers were competent to do acts concerning the title and possession so far as the city claimed title and possession for itself. (7) The allegations in the city's answer in the Grant suit are binding upon it. (8) The City of Kansas was in possession as an intruder and trespasser after the land was leveled to the grade of the streets surrounding it and park made of it. (9) The public as the grantee and beneficiary of the easement was entitled to do as it pleased with the right of easement vested in it, irrespective of any claim made by the City of Kansas.

ALEXANDER MARTIN, Special Judge. — This is a suit in ejectment, brought in April, 1884, by John Campbell and some thirty other plaintiffs, as owners in common, against the City of Kansas, for recovery of a block of ground situated in said city, between Oak and Locust streets and Missouri and Independence avenues. The petition is in the usual form, alleging the right of possession in plaintiffs, and their ouster and dispossession by defendant.

The answer, along with a general denial, contains averments of some evidential facts, admissible under the

Campbell v. The City of Kansas.

denial, to the effect that the land sued for was dedicated to the public use for graveyard purposes, by the original proprietors of the "old town, Kansas City," in 1847; that, ever since the dedication, it has been used for graveyard purposes; and that it is a graveyard still.

The plaintiffs, in reply, after denying generally, alleged that in April, 1884, the defendant filed an answer to a certain suit in the Jackson county circuit court, brought by one Nathaniel Grant, wherein the City of Kansas, defendant therein, averred that by ordinance of October 30, 1857, the land in controversy was vacated for graveyard uses, and "that since October 30, 1857, said land has not been used for or as a graveyard," by reason whereof it is claimed that defendant is now estopped from asserting anything to the contrary. As no judgment is pleaded, there could be no estoppel. As an adverse admission, the evidence was received. The case was taken by change of venue to the circuit court of Johnson county, where it was tried for the third time; this last trial being before his honor, Judge GIVAN, of that circuit. The trial resulted in a verdict and judgment in favor of plaintiffs, from which the defendant prosecutes its present appeal.

In order to understand the issues of law which come before us, it will be necessary to state briefly, in a general way, the leading features of the case as developed at the trial. It appears that the original proprietors of the land whereon stands Kansas City made three plats of the town-site,—one in 1839, before full acquisition of title; another in 1846, which covered only about half of the town-site; and a third one in June, 1847, which included and superseded the two previous ones, and which alone includes the land in controversy. The plat of 1847 discloses additional lots laid off for sale just north of the land in controversy, and east of the lots formerly platted. It also includes, contiguous to these additional city lots, certain parcels of land,

ranging from one to four acres each in extent, and numbered from 1 to 32, inclusive. The names of the respective proprietors appear on these lots as if with reference to a contemplated or accomplished partition between them, excepting lot numbered 21, which is marked on the plat as "Donated for graveyard." This plat was made by Mr. John C. McCoy, a surveyor, and a witness in the case, who was one of the original proprietors of the town-site, under whom plaintiffs claim title. It does not appear to have been signed or acknowledged by any of the proprietors. Neither was it recorded at the time, or marked "Filed," although it was deposited with the recorder of titles in 1849.

Prior to 1849 there was no statute requiring town-plats to be recorded. After the statute was passed containing this requirement, this plat seems to have been recorded. At the sale which followed the making of the plat, it was exhibited to the purchasers; and deeds were made in conformity with it, and by reference to it. Prior to 1847 a very few burials had taken place on a high knoll or ridge which lay near the northwestern corner of the square, extending into the street on the north side, which was not distinguished from the ground in controversy by any visible boundary at that time. After the ground was platted, in 1847, the inhabitants of the town and the vicinity continued to bury in this land, mostly on the western half, which was higher than the eastern portion, making use of the unimproved streets on the north and west for the same purpose. The burials could not have been very numerous, as the town had only about one hundred inhabitants in 1847, and less than five hundred in 1857, when interments in it ceased.

On the thirtieth of October, 1857, the city council passed an ordinance vacating the land in controversy for graveyard purposes. It subsequently notified, by newspaper publication, the relatives of persons buried there to remove their remains. The evidence relating

to what was done with the land since 1857 is very volu-
minous, and need not be stated here in detail.  In a
general way, it may be stated that the city took exclu-
sive possession of the land ; that no further burials in
it took place, except, perhaps, the burial of an infant ;
that it graded the streets surrounding it ; that it lev-
eled it off, and used it as a place for the workhouse
force to break rocks upon for macadamizing the streets ;
that it graded the land, which was of an uneven sur-
face, lying above the grade in some places from eight to
seventeen feet, and below it in others ; that it fenced it
in, laid walks across it, with turnstiles at the corners ;
that it planted it in trees, sowed it in grass, and lighted
it at night ; that it recognized and treated it as a park ;
that, by reason of its ordinances and improvements,
nothing remains in or about it to indicate that it is a
graveyard.   In all this the public has acquiesced.

I.   It appears from the evidence that Robert Camp-
bell, William Gillis, Fry P. McGee, John C. McCoy,
Henry Jobe, Jacob Ragan and William B. Evans, as
early as 1838, acquired a body of about three hundred
and twenty-five acres of land, in which is included the
site of Kansas City.   They became owners in common,
in fee simple, and the plaintiffs claim the land in contro-
versy as their heirs or assigns.   The right of the plain-
tiffs to have in this suit all which the original proprietors
would be entitled to were they suing is not denied in
the arguments before us.   It is clear from the testimony
in the record that the original proprietors never devoted
this land to the use of a graveyard by any instrument
of writing, in the form of deed or plat, sufficient to
comply with the requirements of the law relating to the
transfer of interests in real estate.   It, therefore, follows
that the legal fee must remain still in the original
proprietors or their legal representatives.   But the
actual use of land may be devoted to public purposes
without deed or writing of any character.   Proof
of such devotion may consist of acts *in pais* going to

show that the owners intend to donate the use for a public purpose, and that the public has accepted and used it for that purpose. The estate thus parted with does not extend beyond the use of the land, leaving the technical legal fee in the donors, which, however, must be held by them for the donated use as long as that use continues. While the plat of 1847 could not operate to pass the fee simple of this land to the public, or to any trustee of the public, it constitutes an important and controlling fact in the evidence to establish a dedication of the use of the land as claimed by the defendant. The donation of the land was marked on the original plat of 1847, which was made by one of the proprietors, and was used by him at the public sale which took place soon thereafter. The public accepted the use thus indicated by burying their dead on the land for about ten years. The plat and the use of the land, as indicated by the plat, were acquiesced in by all the proprietors. These facts constitute the best evidence possible of a dedication *in pais* to the public, which dispenses with the necessity of written instruments, as well as the existence of a grantee or trustee. Such I understand to be the established law of the state on the subject of dedications of land to public use. *Becker v. St. Charles*, 37 Mo. 13 ; *Putnam v. Walker*, 37 Mo. 600 ; *Rutherford v. Taylor*, 38 Mo. 315 ; *Price v. Thompson*, 48 Mo. 365 ; *Reid v. Board of Ed.*, 73 Mo. 304.

II. In their argument the learned counsel for the plaintiffs contended that, notwithstanding a dedication of this land to the public for the purposes of sepulture, the owners of the fee ought to recover actual possession thereof during a continuance of the use for which it was dedicated ; not, perhaps, an exclusive possession, as against the public or the municipal guardian of the public, but as cotenant with it, or subject to the reasonable use of it by the public. To sustain their position, cases are cited in which it has been held that the donors

of land dedicated to public uses are entitled to actual possession for the purpose of exercising any rights of property in the land which are not inconsistent with the use for which it was dedicated. I am convinced that the cases cited have little or no application to the case at bar. They proceed upon the assumption that, after dedication to the particular use contained in the dedication, there may remain other beneficial uses for the enjoyment of the donors which could not in any manner interfere with or prejudice the use for which the dedication was made.

In the case at bar the donors have devoted the whole use of this land for the purpose of continuous burials, and as a place for the repose and memory of the dead. In my judgment, no conceivable right of private beneficial enjoyment could remain in the donors, as owners of the fee, which would not be inconsistent with the right of sepulture, to which they have devoted it. Crops, for their gain and sustenance, could not be grown upon its surface, nor could dwellings for their shelter and enjoyment be erected within its limits, without interfering with the solemn use, the sanctity and repose implied in the purpose of the dedication. The sunshine and laughter of inhabited dwellings, as well as the " toil and endeavor " of business pursuits, are out of place in cemeteries of the dead. According to our law governing the subject of ejectment, the plaintiff cannot prevail unless he has the immediate right of possession at the commencement of his action. As long as the rights of sepulture, parted with in the donation, are outstanding in the public, the plaintiffs have no right to recover the use of the land for any enjoyment or purpose of their own. *Hunter v. Trustees*, 6 Hill, 407. The city, as trustee and representative of the public, has the right of actual possession for the purposes of the dedication, and the donors have no other rights than such as any inhabitant of the city may use and possess. I am satisfied that the court below was right in declining to adopt

the opposite view of the case as presented by counsel before us, and denied by that court in its rulings.

III.   Having reached the conclusion that the plaintiffs dedicated the exclusive use of the land in controversy to the public for the purpose of a graveyard, it is proper, next, to consider whether the use thus dedicated is a perpetual one, and left no possibility of a reverter to the original donors, or their legal representatives. If it be true that the use parted with is perpetual and eternal, then it is a matter of no consequence to the plaintiffs what the public or the City of Kansas, as its representative, has done with the land ; for no abuse and no abandonment could restore it to the original donors or the plaintiffs representing them. Their interest would be nothing more than the interest of any other inhabitant of the city or its vicinity to enforce the protection and preservation of the land for the uses of a graveyard forever. If the dedication left no possibility of a reverter, then it will not be necessary to consider any other questions in the case.   The literature of religion and piety has clothed trusts, of the kind in controversy, with attributes of perpetuity which I am satisfied cannot be sustained by science, history or the best-considered decisions of the courts.   This sentiment, based on piety and common reverence, will be found expressed in the *dicta* of decisions, rather than adopted in the result of the judgments ; and, even when most earnestly expressed, it is usually accompanied with qualifying phrases which make against the principle of absolute perpetuity.   In *Brendle v. Congregation*, 33 Pa. St. 422, the .judge, in rendering his opinion, says : "We hold that the ground once given for the interment of a body is appropriated forever to that body.   It is not only the *domus ultima*, but the *domus æterna*, so far as eternal can be applied to man or terrestial things. *Nothing but the most pressing public necessity should ever cause the rest of the dead to be disturbed.*"

All expressions declaring an eternal and perpetual use should be accepted with qualifications which arise from the nature of the subject-matter, and from necessities of the public good. No human body committed to the earth preserves forever either identity or trace of form. No monument placed above it is proof against the corroding touch of time. In the progress of the ages, both body and monument fade away. The temporary nature of the tenement we live in is more truthfully expressed in the verse of a living poet:

> "The house was builded of the earth,
> And shall fall again to ground."

If every portion of ground which has been made a burial place for man should be devoted in perpetuity for burial uses, the most populous and cultivated districts of the world, where millions upon millions of the human race have sunk into the earth in the countless ages of the past, would have to be abandoned as a dwelling place or means of support to the living inhabitants of the present day. The devotion of land to any particular use must be subject to the changes and vicissitudes which time may bring to it. The use of a graveyard is twofold,—for the purpose of continuous burials, and for the purpose of preserving the remains and memory of those who have been buried. The original uses can be continued only by the public continuing to bury, or by continuing to protect the remains already buried, and to preserve the identity and memory of the persons who have left them. It can hardly be said that there is anything compulsory on the public to do this, although desecration can be prevented at the instance of anyone. The public may cease to bury in the dedicated ground whenever it pleases. It may also refuse or neglect to either erect or preserve any monuments to indicate the identity of those already buried, or to give and continue to the place the character and name of a graveyard. When this happens the original use terminates, and the

fee vests in the original donors, or their legal represent-
atives, free from it. It would be unjust that the public
should retain the use for any other purpose than the one
for which it was dedicated.

There are also certain rights of sovereignty to which
all land devoted to burial purposes must be subject. I
allude to the right of eminent domain, and the right to
pass all reasonable laws and regulations for the health
and welfare of the living. A constitutional exercise of
these rights may terminate the use of a graveyard for
all the purposes for which it was donated. In *Kincaid's
Appeal*, 66 Pa. St. 411, Mr. Justice SHARSWOOD recog-
nized the validity of an act of the legislature which
authorized the disinterment and removal of bodies from
a graveyard. He says: " We cannot doubt that it is
competent for the legislature to authorize *or to delegate
that power* [ of disinterment ] to the municipalities. It
is a police power necessary to the public health and
comfort. As they can authorize the removal of any
other thing which they may deem a nuisance by a sum-
mary proceeding, without a jury trial, so they can
authorize and direct the removal of dead bodies from
any ground, *and the consequent vacation of it as a
burying-ground.* * * * As to those recently interred,
the necessity, with a view to public health and comfort,
of removing them, is as apparent as the prohibition of
future interments. With those which have become
entirely decomposed, leaving only the bones, that neces-
sity may not be so urgent; *but of that the legislature
are the exclusive judges.* They may direct the removal
in such manner and upon such terms as to them may
seem wisest and best, having due regard to that feeling
of reverence and attachment which all men naturally
have to the spot where the ashes of their departed ances-
tors and friends repose, and the strong desire that, if
possible, they should not be disturbed. *Even these feel-
ings, however, must yield to the higher consideration
of the public good.*"

In *Gilbert v. Buzzard*, the court says: "It has been argued that the ground once given to the interment of a body is appropriated forever to that body. * * * The time must come when posthumous remains must mingle with, and compose a part of, the soil in which they have been deposited. * * * The legal doctrine, certainly, is, and remains, unaffected, that the common cemetery is not *res unius ætatis*, the exclusive property of one generation now departed, but is likewise the common property of the living, and of generations yet unborn, and subject only to temporary appropriation." 3 Phillim. Ecc. R. 335. Language of the courts indicating the temporary nature of graveyard uses will be found in the following cases: *Windt v. Church*, 4 Sandf. Ch. 471; *Partridge v. Church*, 39 Md. 631; *Page v. Symonds*, 63 N. H. 19; *Sohier v. Church*, 109 Mass. 21.

An interesting question bearing on the right of reverter, and arising out of the law of charitable uses, has been suggested in the opinions of courts cited by counsel before us, rather than in the points made and elaborated by them. When land is donated for a mere public use, such as highways, streets, wharves, parks and landing places, the use of the land reverts to the donor upon discontinuance or abandonment of the particular use for which it was donated. This is the result according to the authorities governing the modern law of dedication. Washb. Eas. 200; *Hooker v. Road Co.*, 12 Wend. 371; *Austin v. Parish*, 21 Pick. 223; *Beardslee v. French*, 7 Conn. 125; 3 Kent, Comm. [6 Ed.] 448; *Jacksonville v. Railroad*, 67 Ill. 543. Land may be dedicated to pious and charitable purposes, as well as for public ways, commons and other easements in the nature of ways. *Pearsoll v. Post*, 20 Wend. 111. Now it seems to us that the dedication in this case falls fairly enough within the general definition of charitable and pious purposes. *Commissioners v. Church*, 30 Kan. 620. Such uses, we

know, are more often free from the incidents of reversion and resulting trusts than subject to them. We have seen that the rule "once a graveyard always a graveyard" cannot be maintained in the face of modern law. The question closely allied to it is whether, after the land donated for a charitable purpose, such as a graveyard, ceases lawfully to be devoted to that use, or becomes impossible to be so devoted, must it remain with the public, or the representative of the public, subject to be appropriated and used for other charitable purposes germane to the original one for which it was donated, in accordance with the equitable doctrine of *cy pres*, which has been to some extent recognized in the decisions of this state.

I do not deem it necessary to consider the general principles upon which a court of equity will determine whether the charitable intention of a donor has come to an end, or whether it may be continued in a changed or modified form, so as to cut off all rights of reversion. The courts in this country have very generally ignored or denied the existence of the doctrine of *cy pres* as bearing upon donations or dedications of land made for particular charitable uses, such as graveyards and schools. *Society v. Dugan*, 5 Atl. Rep. 420 ; *Reed v. Stouffer*, 56 Md. 254; *Hunter v. Trustees, supra;* *Weisenberg v. Truman*, 58 Cal. 70 ; *Carter v. Portland*, 4 Or. 348 ; *Appeal of Gumbert*, 1 Atl. Rep. ( Pa.) 438 ; *Schlessinger v. Mallard*, 11 Pac. Rep. ( Cal.) 728 ; *Venable v. Coffman*, 2 W. Va. 310 ; *Still v. Trustees*, 16 Barb. ( N. Y.) 112 ; *Brown v. Church*, 23 Pa. St. 495 ; *Foster v. Dodd*, 17 Law T. R. 614; Washb. Eas. 200 ; *Kirk v. King*, 3 Pa. St. 436.

In the case of *Board v. Edson*, 18 Ohio St. 226, it appears that land had been donated, or rather dedicated by plat, "for school purposes, and on which to erect schoolhouses." This donation undoubtedly fell within the classification of charitable dedications. It was accepted and used by the public for school purposes

for many years. In the course of time the land became useless for school purposes on account of the proximity of a railroad. The board of education filed a bill setting out these facts, and asking to have the lots sold, and the proceeds applied to purchasing other property to be devoted to the same purpose. On a demurrer to the bill by the representatives of the original dedicators, it was dismissed. The court declared: "Should the *sole* uses to which the property has been dedicated become impossible of execution, the property would revert to the dedicators or their representatives. Is it competent for a court of equity, without the consent of the dedicators, to extinguish forever this right of reversion by ordering a sale of the property, and assuming to execute the trust *cy pres*, by transferring it to the proceeds of the sale? We think judicial power cannot legitimately be so far extended."

In the case of *Rutherford v. Taylor*, 38 Mo. 315, Judge WAGNER seems to regard dedications of land to any lawful use, whether public, pious or charitable, as all alike, so far as the rights of the donor are concerned. He treats the donor's rights as resting *solely* on the law of estoppel *in pais*, precluding the rights of the donor during continuance of the use for which it was dedicated. I may add here that the right of retention as a possible incident to this dedication does not come fairly before us on the record of the case. No court of equity has assumed to order a sale of the land in controversy for the purpose of purchasing another graveyard. Neither does the city assume to retain the land for the purpose of appropriating it to any kindred use with the dedication. If it be a fact that it permits it to be used as a park or place of recreation for the comfort or amusement of the living, the use could not be justified as an application of the doctrine of *cy pres*. But the city, in its answer, denies any diversion, and expressly alleges a continuance of the original use for which it was dedicated. It claims in its answer, and in the

arguments of its counsel, that the place is still a grave-yard. Under these circumstances, I think this court is relieved from the task of determining whether this dedication is subject to the doctrine of *cy pres.* It is not called upon by the state of the record to authoritatively dispose of such a question. My conclusion is that the plaintiffs in the case made in this record must prevail if the use of the land for a graveyard has been discontinued and abandoned by the public and its representatives. Upon any lawful cessation of the use, the title reverts.

IV. This brings us to the issue of fact made between the parties to the suit, the principal issue of the controversy, which was submitted to the jury, and decided in favor of the plaintiffs. It is not an issue for this court to determine. As an appellate tribunal, it can only decide whether the issue of discontinuance, and abandonment of the use, was submitted to the jury on proper instructions of law to guide them, and whether their finding of the issue is supported by substantial evidence tending to prove the issue as found by them.

The question was submitted on the following instructions : "1. The court instructs the jury that, to constitute abandonment of a graveyard, it is not sufficient that burials therein have ceased or been prohibited. So long as it is kept and preserved as a resting place for the dead, with anything to indicate the existence of graves, or so long as it is known or recognized by the public as a graveyard, it is not abandoned. On the other hand, it may contain the remains of the dead, and yet be abandoned. If no interments have for a long time been made, and cannot be made, therein, and, in addition thereto, the public, and those interested in its use, have failed to keep and preserve it as a resting place for the dead, and have permitted it to be thrown out to the commons, the graves to be worn away, grave-stones and monuments to be destroyed, and the graves

to lose their identity, and if it has been so treated and used or neglected by the public as to entirely lose its identity as a graveyard, and is no longer known, recognized and respected by the public as a graveyard, then it has been abandoned ; or if the public, and those interested in its use as a graveyard, have permanently appropriated it to a use or uses entirely inconsistent with its use as a graveyard, in such a way as to show an intention of permanently ceasing to use it as a graveyard, and it has become impossible to use it as a graveyard, then it has been abandoned ; and in determining the question of abandonment the jury should take into consideration all the facts and circumstances given in evidence.

"2.    Although you may believe from the evidence that the land in controversy was dedicated, at the time and in the manner as alleged in defendant's answer, to the public for its use as a graveyard, and that the public, for a number of years after such dedication, used the said land for such purpose, if you further believe from the evidence that the public, and those interested in the use of said land as a graveyard, had before the commencement of this suit abandoned the same as a graveyard, and that the same was not at the commencement of this suit a graveyard, and was in possession of defendant, then you should find for the plaintiff."

I have considered these instructions very carefully ; and, although they may be open to the criticism of repetition and redundancy, I am satisfied that they gave the jury to understand very clearly that the plaintiffs were not entitled to recover unless the jury was satisfied from the evidence that the original uses for which the land had been dedicated had been discontinued and abandoned before the commencement of the suit.

In order to determine whether there was evidence to sustain the finding of the jury on this issue, it will be necessary for me to recall briefly the evidence proving, or tending to prove, what was done, or permitted

to be done, with the old graveyard both by the city and the public at large. The dedication in 1847 took place before the incorporation of the present city. When the city was incorporated, in 1852, its limits included the graveyard. It is distant now only a few blocks from police headquarters. On the fourteenth of May, 1855, it was resolved by the city council that the location of this graveyard was too near the business thoroughfares of the city, and that immediate steps should be taken for the purchase of other grounds for burial purposes. On the thirtieth of October, 1857, an ordinance was passed accepting the proposition of the Union Cemetery Association to sell the city five acres for a potter's field. By the second section of the ordinance the land in controversy was "*vacated for graveyard uses*," and a penalty ranging from $25 to $100 was imposed on anyone who should inter therein the body of any person whomsoever. In its capacity as trustee and guardian of the rights of the public in this graveyard, the city had no power to change or destroy its use. *Trustees v. Council*, 33 N. J. Law, 19 ; Mo. Sess. Acts, 1875, pp. 204, 205 ; *City of Hannibal v. Draper*, 15 Mo. 634. But, as an arm of the civil government, it was vested with full police power, as early as 1853, " to make regulations to secure the general health of the inhabitants, and prevent and remove nuisances." This general grant of power has been usually accepted as sufficient to authorize the prohibition of burials, and discontinuance of graveyards, in the populous districts of cities. *Bogert v. Indianapolis*, 13 Ind. 134 ; *City Council v. Church*, 4 Strob. ( S. C.) 306 ; *Coates v. New York*, 7 Cow. 585 ; *Austin v. Murray*, 16 Pick. 127.

The prohibition of future burials destroys at once the interest of the public generally in a graveyard. Only those members of the public who have relatives buried there could have any special interest in it,—an interest to preserve the remains and monuments of the

dead. *Kincaid's Appeal, supra; Gumbert's Appeal, supra; State v. Wilson,* 94 N. C. 1015. The effect of such a prohibition in discontinuing the land entirely for graveyard purposes would be soon worked out by the lapse of time. Its effect would be more marked upon a graveyard like the one in controversy than upon an old cemetery filled with graves and costly monuments. It will be observed that the ordinance does not consist only in a positive prohibition of future burials. The import of its language bearing upon the discontinuance of this ground as a graveyard is unqualified, and assumes to vacate the ground for all graveyard uses. The language contemplates and authorizes disinterment, if that should be necessary to complete the vacation of the land for graveyard uses. The subsequent action of the city council and city authorities is in strict accord with this construction of the ordinance. In August, 1866, the city council, by published notice, required all persons who had relatives and friends buried within the square to remove them. The evidence shows that this was very generally done. The city undertaker, while engaged in removing the remains of the unknown to the potter's field, says that he removed to other places remains which were claimed by friends and relatives. Many removals took place under the direction and supervision of relatives and friends of the dead. But notwithstanding the notice of removal, and the actual removal by relatives, the majority of the remains were left to be removed by the city.

Originally the land in controversy was part of a high knoll or ridge running almost north and south. Its highest elevation was near the northwest corner. From this point, it sloped gently towards the south and east, also slightly towards the west, which was bounded on the original plat by Oak street. Locust street, which bounds the square on the east, was graded in 1868 or 1869 by raising it several feet above the square in certain points with earth obtained from the square. The

embankment resulted in a pond on the square which subsequently was filled with earth from the square. In 1869 some grading was done on Oak street, and then, or during the gradings which followed, the square was used at times by the city, with its workhouse force, breaking rocks for the streets. In 1870 and 1871 a portion of the north side of the square was taken to fill up Fifth street, which was in the vicinity. In 1872 came the grading of Missouri avenue, which bounds it on the north. The grade ranged from five to seventeen feet below the surface of the square. In 1872 or 1874 the further grading of Oak street took place. The grades on Oak street and Missouri avenue left the square many feet above the grade. In the course of time the embankments left by the grades sloughed off, leaving in many places the remains and coffins of the dead exposed to view. In 1878 or 1879 the city completed the grading of the square, reducing its high parts, and bringing up its low parts to a level with the surrounding streets. It is claimed on the part of defendant that this was necessitated by the grading of Oak street and Missouri avenue, which left the unsightly banks of the square open to public comment and criticism. On the part of plaintiffs, it is claimed that this final grading of the whole square was in pursuance of a resolution of the city council passed in June, 1877, which reads as follows: "Be it resolved by the common council of the City of Kansas that the city engineer be instructed to employ the workhouse force, when not otherwise engaged, *to grade the old graveyard, and get it in shape for a public park.*"

There is much evidence in the record tending to prove that the grading of the square went below all the graves in it except, perhaps, a few buried in the low parts of the square on the eastern slope, upon which from four to ten feet of earth has been placed. According to the evidence of the city undertaker, who had a contract from year to year for the removal of remains,

and who received a compensation therefor at the rate of $5 a skull, all the remains in the square encountered in the gradings prior to 1878 were removed either by him or friends of those who could be identified. In this testimony he is corroborated by other witnesses. The undertaker did not attend the final grading in 1878, and what was done with the remains then exhumed will be noticed presently. After the final grading the ground was in other respects improved and ornamented as already stated. Trees were planted, grass sown, walks laid out through it, and it was lighted for the convenience of the public. It has been used for public entertainments, accompanied with music and feasting. It is named and recognized by the city as a park. No visible grave or monument to perpetuate the memory of the dead is discernible to the visitor. It is used and recognized by the public, as well as the city, as a park for the living, and not as a graveyard for the dead. The public has acquiesced in the change.

It would not be proper for me to close this opinion without some notice of the facts and acts which the defendant pretends are sufficient to preserve this land as a resting place for the repose of the dead, and for perpetuating their memory. During the final grading in 1878 the city authorities discontinued the removal of the remains exhumed, and caused the bones to be gathered up by the workhouse force engaged in the grading, and reinterred as near the place from which they were taken as possible. This was done in small pine boxes, procured from a planing-mill, about ten inches wide and deep, and from two to three feet long. Some of the witnesses say that no attempt at preserving the separate identity of the remains was made. Skulls and bones which had no connection with each other in life were frequently thrown with mould into the same box. Other witnesses testify that the individuality of the

remains was preserved in the reinterment except in some cases, where a great many remains were found in one grave.   There is a conflict of evidence as to the number of these pine boxes containing unknown bones and mouldering earth, the plaintiffs fixing the number at eleven, while the defendant claims there must have been eighty-four.

There is evidence tending to show that, when the boxes were buried, stakes were driven so as to indicate their location, and that afterwards small stones, eight by ten or twelve inches in surface, took the place of the stakes.   These stones had no names on them, but were numbered.   They were either placed five or six inches under the earth, or they had sunk to that depth before the trial of this case, as many witnesses testify that they never saw them in the square.   Shortly before the trial at Warrensburg, the existence and location of many of these stones, under instructions from defendant's agents, were ascertained and brought to light by "prospecting" through the square with a sharp iron rod.   Some of them which were thus found have been uncovered.   One of the stones is said to be in the line of a walk which has been uncovered for some time, possibly in laying out the walk.   It is claimed that Mr. Reinhart, a witness for defendant, has identified the grave of a brother fourteen years old, buried some thirty odd years ago.   I have read his evidence carefully, and find in it too much doubt and uncertainty to justify the conclusion he swears to.   When the public was removing remains from the ground before it was graded, Mr. Reinhart went to the graveyard for the purpose of ascertaining the location of his brother's remains, with a view to their removal.   He admits that he could not then find the grave.   After the grading, he finds in the ground a broken piece of stone, without name or number, which he claims to identify as a part of the base of the tombstone of his brother; and from this he infers that

his brother's grave is there or near by.    He never uncovered the surface to see what was below.    It is from evidence relating to these reinterments that the defendant insists that this ground is still preserved for the uses of a graveyard.

There is evidence tending to show that the reinterments made in 1878 were directed by the city authorities for the sole purpose of preventing a reverter of the land.  ·This was advised by the city engineer as early as 1873, and there were persons present at the reinterments of 1878 who testify that the city engineer and other city officers admitted that such was the purpose still.    The defendant's evidence relating to these reinterments went to the jury for what it was worth.    It was fairly susceptible of the construction that it was not a genuine movement in the way of repentance, as ingeniously claimed by defendant's counsel, to preserve the remains and memory of the dead, but as a sham and a fraud on the donors and their representatives.    The jury must have found that there was nothing in it which could operate as a revocation of the ordinance, notice and previous acts of the city vacating the ground "for graveyard uses."    They must have been satisfied that the use of this land for the purpose of a graveyard could not be continued for ages to come by such a transparent device and weak invention.    As this finding is sustained by competent and abundant evidence, it ought not to be disturbed by this court.

It may well be that the donors of this land never actually contemplated any return of it to themselves or their representatives.    It is not at all probable that they foresaw the marvelous growth and sudden splendor of the city which has sprung to life around the old graveyard as if evoked from airy nothing by the wand of some mighty magician.    But their gift was made, necessarily, subject to the unforeseen changes in the womb of time, and the demand of a higher public weal.

V. It has been argued by counsel for defendant that, as the donors of this land sold other parcels on the showing of the map or plat which dedicated it to the public use, they must have received value for their dedication in the increased price of the sales, and that they are estopped from claiming a return of the land. It may well be that the dedication of highways and parks furnishes a valuable inducement to purchasers of surrounding property. But I do not think that the proximity of, or convenient access to, a graveyard can be reasonably classed among the inducing causes of the sale of real estate. One witness in this case testifies that he was deterred from buying by reason of the existence of this old graveyard. I do not think that easy and convenient access to cemeteries can be regarded as an inducement which would add any appreciable value to the sale of contiguous property. Upon the whole, I am persuaded that the verdict and judgment are for the right parties, and should be affirmed, and it is so ordered. RAY, C. J., and SHERWOOD and BARCLAY, JJ., concur; BRACE, J., dissents; BLACK, J., not sitting.