## YOUNG v. BOARD OF COM'RS OF MAHONING COUNTY et al.

*(Circuit Court, N. D. Ohio, E. D.  May 21, 1892.)*

1. FOLLOWING STATE PROCEDURE—EJECTMENT—PLEADING.
    In an action brought in the circuit court for the northern district of Ohio for the recovery of real property, although the form of procedure is under the Code of Ohio, the remedy is substantially that of ejectment at common law, and therefore in such action matters cannot be pleaded in the answer, or averred in the reply, which are only of equitable cognizance.

2. ESTOPPEL IN PAIS.
    Where a person claims a reverter of lands dedicated as a burying ground because of the abandonment of such use and the erection of a courthouse thereon, there is no room for an estoppel on the ground that he stood by in silence during the erection of the building, when it appears that he had not been in the town for 40 years, and in fact was not aware of the abandonment for 10 years after the courthouse was completed.

3. CEMETERIES—DEDICATION—ABANDONMENT—REVERTER.
    The city council of Youngstown, Ohio, by an ordinance passed in pursuance of the authority conferred by sections 20 and 23 of the Municipal Code of Ohio, as amended by the act of March 30, 1859, (56 Ohio Laws, 88,) prohibited any further interments in certain lots within the city limits, which had been dedicated and used as a burying ground, and ordered the removal of all remains buried there. *Held*, that the ordinance was a valid exercise of the police power of the state, and binding on all the inhabitants of the city, and therefore operated as a complete abandonment of the dedicated use, such as would cause a reverter of the lands to the original owner or his heirs.

4. SAME—CY PRES—PRESUMPTIONS.
    There was no room in such case for the application of the equitable doctrine of *cy pres*, for a dedication, especially a common-law dedication, is of the land for a specific use, and it is not within the presumed intention of the dedicator that the lands shall be sold and the proceeds applied to a similar use.

5. SAME—QUITCLAIM DEED—CONSTRUCTION.
    In 1802 the founder of Youngstown, Ohio, signed and recorded a town plat, on which certain lots were marked as "Burying Ground," but he failed to acknowledge the plat, as required by the Ohio Statutes, and therefore the fee did not pass. The lots, however, were long used as a burying ground, with the acquiescence of himself and his heirs. In 1865 an adjoining lot owner fenced in a portion of the graveyard, and an action was brought in the name of the county commissioners to recover the same, but was defeated on the ground that the commissioners had no title. Thereafter certain persons interested in protecting the graveyard procured an act of the legislature, (64 Ohio Laws, p. 102,) providing that the title, right of possession, and control of all dedicated graveyards, and those used as such, but not dedicated according to law, are hereby vested in the cities, towns, and villages in which the same are located; and the council thereof shall have power to preserve and protect them, and "make such ordinances, sales, and regulations" as shall be necessary, and to bring suits to recover possession thereof, and protect the same against trespassers. Thereafter the parties who had interested themselves in the matter wrote to the heir of the dedicator, who lived in New York, explaining all the facts in the case, especially the trespasses, the litigation, the want of acknowledgment to the plat recorded by his ancestor, and the passage of the act of the legislature, and appealed to him to make a quitclaim deed to the village, sending him a draft thereof. This deed he accordingly executed. The grant therein was to the village of Youngstown and its successors, forever, "to be under the authority and control of its proper council and municipal authority in conformity with the act of the legislature in that behalf." *Held*, that the act of the legislature referred to was the one procured by the interested parties, and the effect of the reference was to require it to be read into the deed; and that, taken in connection with all the circumstances, the deed must be considered only as a means of correcting the want of acknowledgment on the original plat, and conveyed, not a fee simple, but merely a determinable fee; and that a reverter took place when the use as a burying ground was authoritatively abandoned.

6. SAME—CONDITION SUBSEQUENT—CLAUSE OF RE-ENTRY.
    The conveyance being in fee to the village to exercise a certain defined possession and control, namely, that possession and control exercised by the public over an easement acquired by a common-law dedication, the fee reverted by a simple termination of the estate on the impossibility of exercising that possession and control;

and the cases which hold that a condition subsequent cannot be created in a deed by limiting the use, unless there be a clause of re-entry for forfeiture, have no application.

7. SAME—CONSTRUCTION OF DEED—EVIDENCE.
    In construing the deed the circumstances surrounding the transaction and within the knowledge of both parties were admissible in evidence, and therefore the letters communicating to the grantor the situation in respect to the cemetery were competent; but any declarations by the grantor as to his intention in making the deed were irrelevant.

8. SAME.
    An attorney who had long acted as counsel for the grantor in other matters, represented the interested parties in the suit respecting the cemetery, and joined in the representations made to the grantor for the purpose of procuring the deed. Afterwards the attorney, in a memorial to the village council on behalf of the interested parties, requesting it to accept the deed, expressed the opinion that the deed so vested title in the village as to permit the use of the ground for other purposes, should the health of the city require its abandonment as a burying ground. *Held*, that this statement was irrelevant on the question as to the effect of the deed.

At Law. Action by Charles C. Young against the board of county commissioners of Mahoning county, Ohio, the city of Youngstown, Ohio, and others, to recover lands. Jury waived, and trial to the court. Judgment for plaintiff.

Statement by TAFT, Circuit Judge:

This is an action for the recovery of the possession of real property by Charles C. Young, a citizen of the state of New York, against the county commissioners of Mahoning county, Ohio. The subject-matter of the suit is lot No. 96 of John Young's original plat of the village of Youngstown, upon which now stand the courthouse, jail, and county offices of Mahoning county. John Young, the common source of title for plaintiff and defendants, signed and recorded in 1802 a town plat of 100 lots in the township of Youngstown, then in the county of Trumbull, but now in that of Mahoning. The plat was accompanied by a description of the streets and squares it purported to dedicate, but it was not acknowledged in accordance with the statute then in force, and did not, therefore, have any effect to take the fee out of John Young. Lots Nos. 95 and 96 on this plat were each marked with the words "Burying Ground." They lie on opposite sides of Market street, and on the south side of North street, in the present city of Youngstown. From the early part of the century until 1868 the lots were used as a burying ground. In 1865, one Niblock, owning an adjoining lot, fenced in 30 feet of lot No. 95. This was much resented by the older citizens of Youngstown, whose parents and relatives were buried in the cemetery, and the aid of a local court was invoked to prevent the desecration. Suit was first brought in the name of the county commissioners, but was defeated on the ground that title to the lot was not in them. Suit was then brought against Niblock in the name of four citizens of Youngstown for the benefit of the public. Gov. David Tod, whose father was buried in the old cemetery, was one of the plaintiffs, and took an active part in the controversy. B. F. Hoffman was retained as counsel for the plaintiffs in that suit in 1866. To meet the difficulty about the title, Hoffman drew and procured the passage of an act by the legislature, (April 3, 1867,) entitled "An act for the protection of certain graveyards and burial

grounds," (64 Ohio Laws, p. 102.) The first section only is important here. It reads as follows:

"That the title, right of possession, and control to and in and of all public graveyards and burial grounds located within incorporated cities, towns. and villages, which have, in fact, been set apart by the owners and dedicated as graveyards and burial grounds, for the use and benefit of the public, and used as such by the public, but which have not been dedicated according to the forms and requirements of law, * * * be, and the same are hereby, vested in the cities, towns, and villages, respectively, where any such graveyards and burial grounds may be located; and the councils of such cities, towns, and villages are hereby authorized and required to take possession, control, and charge of all such grounds within their respective limits, and protect and preserve the same, and make such ordinances, sales, and regulations as may be necessary and proper for said purposes, and consistent with the health and welfare of the inhabitants; and they are also authorized and required, when necessary, to institute suits in the names of said municipal corporations, to recover possession of said graveyards and burial grounds, remove trespassers therefrom, and recover damages for injuries thereto for any part thereof, or to any tomb or monument therein."

Pending the suit, and after the passage of the foregoing act, Hoffman was employed by Charles C. Young, the plaintiff in the case at the bar, who lived in Whitestown, N. Y., to look after pieces of land in Youngstown, title to which, by descent from his father, John Young, the maker of the town plat, and by conveyances from his brothers and sisters, had then become vested in him. Hoffman and Gov. Tod, on behalf of the plaintiffs in the Niblock suit, and for the purpose of removing any question of title from the controversy, appealed to Young to execute a quitclaim deed of the burying ground to the village of Youngstown. Both of them wrote letters to Young, explaining in full the situation, the defect in the original dedication of John Young, the use of the burying ground for half a century with John Young's consent, the actual dedication thereby, the trespass by Niblock and others, the failure of one suit for defect of title, and the recent passage, as an attempted remedy, of the act of the legislature at Hoffman's instance. Young had not been in Youngstown since 1848, and did not visit it again until 1888. His only knowledge of the circumstances was gained from the correspondence with Hoffman and Tod. Hoffman drew the quitclaim deed, and forwarded it to Young, who executed it in July, 1867, and sent it in October of the same year to Gov. Tod, with instructions to deliver it to the council of the village on condition that the village would pay Hoffman $15 due him from Young for services in other matters. By the quitclaim deed, Young, "for divers good causes and considerations thereunto moving, especially for one dollar received to" his full satisfaction, absolutely gives, grants, remises, releases, and quitclaims "unto the said incorporated village of Youngstown and its successors, forever, *to be under the authority and control of its proper council and municipal authority, in conformity with the act of the legislature of Ohio in that behalf*, all such right and title as I, the said C. C. Young, as one of the heirs, and as assignee and grantee of the other heirs and devisees of John Young, the original proprietor of said township and village lands, have or ought to

have in or to the following described lands: Situate in said village, and known and designated on the original plat of said village made by said John Young, and recorded in Trumbull county records of deeds, Book A, page 118, as burial grounds, and being inlots number ninety-five and ninety-six, and used as burial grounds by the citizens of said village and township since about the year A. D. 1799. Said inlot No. 95 lies on the west side of Market street, and extends westerly to inlot No. 94, and covers all the ground inclosed and used as a burial ground for over fifty years; and said inlot No. 96 lies on the east side of said Market street, and includes the ground inclosed and used as a burial ground for a like period. To have and to hold the premises aforesaid unto the said grantee, said incorporated village of Youngstown, and its successors, forever."

After the passage of the act of the legislature referred to above, Hoffman made the village of Youngstown a party to the suit against Niblock; and when the deed was received from Young, on behalf of Tod and the other plaintiffs in the Niblock suit, he filed a memorial with the council of the village, reciting everything which had been done in the suit, including the procurement of the act of the legislature and the quitclaim deed, and praying that the expenses theretofore incurred by the plaintiffs be assumed by the village, and that the suit be thereafter prosecuted by it, and, in furtherance thereof, that the deed be accepted, and Hoffman's fee due from Young be paid. The prayer was granted by the village council, the deed was accepted, all previous expenses and fees were assumed and paid, and Judge Hoffman was continued as the attorney of the village in the suit. In this memorial, Hoffman, as an inducement to the village council to accept the quitclaim deed, expressed his opinion that the deed so vested the title in the village as to permit it to use the burying ground for general public purposes, should the time ever come when the health of the city would require the removal of the cemetery from the village limits. (This statement of Hoffman, as to the effect of the quitclaim deed, as will be seen from the opinion of the court, was held irrelevant and incompetent.) In 1852, a new cemetery had been established beyond the limits of Youngstown, and after 1860 nearly, if not all, the interments were made there. From 1860 to 1865 the remains of some of the dead were removed from the old to the new cemetery. Between 1865 and 1868 the removals were more frequent, and the old ground was much neglected; the fences were not kept in repair, gravel was dug on the lots by the city authorities, and in some instances by private individuals, and hauled away. Finally, on December 22, 1868, the council of Youngstown, which had then ceased to be a village, and become a city, passed an ordinance by which all interments in the old burying ground were thereafter forbidden, and the remains of all already interred there, which should not be removed by friends and relatives before April 1, 1869, were ordered removed at public expense. A second resolution, directing the street commissioner to remove, at public expense, all bodies still in lots 95 and 96, was passed in 1871. After this the lots lay unused, except that gravel was taken from them by the

city authorities for making and repairing the streets. In 1874 the legislature passed an act providing for the removal of the county seat of Mahoning county from Canfield to Youngstown on a majority vote at the next election, and on condition that the citizens of Youngstown should donate to the county a lot or lots, and should erect thereon the county courthouse, jail, and offices, at a cost of not less than $100,000, free of expense to the county. 71 Ohio Laws, pp. 180, 181. The result of the election was favorable to the removal, and March 16, 1875, the council of the city of Youngstown passed an ordinance reciting that the title to the two lots, Nos. 95 and 96, (which by a new numbering had become lots Nos. 355 and 417,) was in the city of Youngstown in fee simple, and directing a conveyance thereof to five named citizens of the city of Youngstown, who were constituted a building committee charged with the duty of erecting the courthouse and other buildings, on behalf of the people of Youngstown, and of conveying the same, when completed and accepted, to the county commissioners of Mahoning county. The ordinance gave power to the building committee to build on either of the lots, or to sell or exchange either or both of them for the purpose of securing a more desirable site, and to devote any sums so realized to the erection of the courthouse. On March 30, 1875, the mayor of Youngstown executed the conveyance accordingly. The courthouse and other buildings were duly erected on lot No. 96, (or, by later numbering, No. 417,) and on August 10, 1876, were conveyed by the building committee to the county commissioners. The courthouse and county buildings have ever since been, and are now, occupied by the courts and officers of Mahoning county. Lot No. 95 was not used by the building committee, and the title to that lot, if the city of Youngstown had the right to convey it, is still in the building committee. The present action involves only lot No. 96. Another action of the same kind, by the same plaintiff, is pending in this court against the building committee to recover possession of lot No. 95.

In the petition the plaintiff averred the original title of John Young, the common-law dedication of the land as a burying ground under the defective plat and subsequent use, the final and lawful abandonment of the lot by the city of Youngstown as a graveyard in December, 1869, the appropriation of it for a county courthouse in 1875, and the consequent reverter to plaintiff as heir, and as grantee of his brothers and sisters, the other heirs of John Young, who died in 1825, intestate. In his first cause of action plaintiff asked judgment for the possession of the property, and in a second sought a judgment for 14 years' mesne profits. The county and the city filed separate answers, which were substantially similar. They deny that plaintiff has any estate in the land sued for. They set up the quitclaim of July 10, 1867, as conveying from him to the city, for a sufficient and valuable consideration, a complete title in fee simple. They plead more than 21 years' adverse possession in defendants from July 10, 1867, and finally they aver that plaintiff has acquiesced in the use of the land for a courthouse; that he has stood by and permitted the expenditure of $100,000 for that pur-

pose, without objection or assertion of title, and is thereby estopped to now assert title. As a defense to the count for mesne profits, the city denied any use or possession of the lot in 14 years, and both plead the four-year and six-year bar of the statute of limitations. The plaintiff replied, denying that the quitclaim deed gave the city a right to use the land conveyed for other than burial purposes, and reasserting the reverter under that deed. Further replying, the plaintiff alleges that the deed was obtained on the representation that the deed was only needed to give title for the purpose of protecting the graveyard, and would only do so, and that, if the deed has any other effect, it is void for fraud in obtaining it; and finally that both parties understood the effect of the deed to be as stated, and, if the language had any other legal effect, it does not express the intention of the parties; wherefore plaintiff prays that the court will reform the deed to that end. A jury was waived in writing by both parties, and the case was submitted to the court.

*Frank Hutchins* and *Gen. Sanderson*, for plaintiff.

*A. W. Jones, Judge Arrel, Hine & Clark, Disney Rodgers,* and *George E. Rose,* for defendants.

Before TAFT, Circuit Judge, and RICKS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This is an action at law. The form of procedure is under the Code of Ohio, but the remedy is substantially that of ejectment at common law. Plaintiff must recover, if at all, on his title as it is. If equitable remedies are needed to perfect his right of possession, he fails. In like manner, only defenses at law are available here. The defense of estoppel *in pais,* pleaded in the answer, would seem to be of equitable cognizance, and hardly to be urged or considered here. However that may be, if it were a valid plea, there is no evidence to support it, because the courthouse was erected 10 years before the plaintiff (who was not in Youngstown from 1848 to 1888) knew anything of the abandonment of the burying ground, or its subsequent use for general county purposes. The averments of the reply which charge fraud in the procurement of the quitclaim deed and a mutual mistake, and upon which are based prayers that the deed be set aside or reformed, present matters only of equitable cognizance, and are wholly irrelevant to this issue. It is questionable practice, even under the Ohio Code, for the plaintiff to ask for new and substantial relief in a reply, (*Bowman* v. *Railroad Co.,* 1 Ohio Cir. Ct. R. 64;) but, however this may be, the averments and prayers referred to are out of place in the action of ejectment.

Plaintiff's title is good, unless it is defeated by the common law dedication of his ancestor, John Young, or his own quitclaim deed. The dedication was to the public, for use as a burying ground. Common-law dedications are said to operate by way of estoppel. *Fulton* v. *Mehrenfeld,* 8 Ohio St. 440: *Wisby* v. *Bonte,* 19 Ohio St. 238. Acquiescence by the owner in the use of his land by the public estops him from asserting a right of possession excluding such use. When, however, the

public voluntarily and finally abandons the use, there is no room for further estoppel. The easement of the public—for such it only is—ceases, and the holder of the title in fee may resume exclusive possession and beneficial enjoyment. The estoppel, of course, can only be commensurate with the specific use, acquiescence in which gave rise to it; and when that use lawfully ceases the dedication has spent its force, and the land reverts to the dedicator and his heirs. A common-law dedication is for the benefit of the public, and every member thereof has an interest in it. Legislation may vest in the governing body of a municipal corporation such complete representative powers as to enable it to bind the general public by an abandonment of a public easement. If the abandonment is lawful, *i. e.*, if made in such a way as to bind the public and all beneficially interested, the easement ceases, and the land reverts. It often happens that the corporation, or its governing body, is merely a trustee for the preservation of the easement, and has no power or discretion to abandon it. In such a case, if the trustee misuses the land, in violation of the rights both of the dedicator and of the *cestuis que trustent*, the dedicator cannot repossess himself, but he or the beneficiaries of the easement may apply to a court of equity to enjoin the misuser, and compel the trustee to allow a resumption of the easement. In such a case, the abandonment of the easement not having been lawful, there is no reverter. Viewed in this light, the authorities are not in conflict. The language of Mr. Justice Mc-Lean in *Barclay* v. *Howell's Lessee*, 6 Pet. 498, is relied on by the defendants as establishing a different rule. He says, (page 507:)

"If this ground had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery to compel a specific execution of the trust by restraining the corporation, or by causing the removal of obstructions. But, even in such a case, the property dedicated would not revert to the original owner. The use would still remain in the public."

This language is quoted with approval by Judge Thurman, in *Williams* v. *Society*, 1 Ohio St. 478–496, with the intimation that it is only where the use becomes impossible that the land will revert to the original donor. The same doctrine thus qualified is to be found in *Le Clercq* v. *Gallipolis*, 7 Ohio, 218–221; *Webb* v. *Moler*, 8 Ohio, 548; and in Dill. Mun. Corp. (4th Ed.) § 653. The principle has application only to cases where the misuser or abandonment is by a trustee controlling the easement and failing to discharge his or its duty. It certainly does not apply where all the persons beneficially interested give up their rights in the easement, for it would be a novel doctrine that an easement may not be abandoned by the public. Indeed, in the very case of *Barclay* v. *Howell's Lessee*, *supra*, Justice McLean says, (page 513:)

"By the common law the fee in the soil remains in the original owner, where a public road is established over it; but the use of the road is in the public. The owner parts with this use only, for if the road shall be vacated by the public, he resumes exclusive possession of the ground."

If a public body is more than a mere trustee in respect to its control of an easement, if it may act on its discretion for the public to say whether the continued enjoyment of an easement is really beneficial to the public, if, in other words, under the law it is the public for this purpose, then it may lawfully abandon it. In every case, therefore, where a reverter of land dedicated to a specific use is claimed by the original owner on the ground of abandonment or misuser, the question whether reverter has taken place, or whether the owner should be remitted to a court of equity to enforce the dedicated use, must depend upon the further question whether the abandonment of the dedicated use was lawful, *i. e.*, not in violation of the rights of any the *cestuis que trustent.* If it was lawful, the land reverts. There is no escape from this conclusion; otherwise, a dedication to a specific use, and acceptance by the public, is a contract by the public forever to continue the use, which neither the public nor the public and the dedicator together can rescind,—a proposition which, I apprehend, will hardly be advanced.

We come, therefore, to the question, was the abandonment of lot No. 96 as a graveyard lawful? The removal from the lot in 1865, 1866, 1867, and 1868 of the remains of many buried there, by their friends, did not constitute an abandonment. The lot did not thereby lose its distinctive character as a burying ground. Nor did the neglect to keep the ground properly fenced, nor the digging and hauling of gravel from its surface, have that effect. But when, on December 22, 1868, the council of the city of Youngstown passed an ordinance prohibiting further interments in lots 95 and 96, and ordering the removal of the remains of those buried there, and the removals were accordingly made, this was a lawful abandonment of the lots as a cemetery. It is quite possible that the council did not so represent the public's interest in the burying ground as to be able to finally abandon it for them. With respect to it, the council was probably only a trustee. But the council, as the controlling authority of the city, thereby exercised lawfully the police power vested in the state government which the legislature had delegated to it. As a measure necessary for public health and comfort, the legislature might lawfully enact that the burying grounds should be removed from cities of the second class,—of which Youngstown was one,—or it might delegate to its council power to ordain the same thing. Dill. Mun. Corp. (4th Ed.) § 372 *et seq.; Kincaid's Appeal,* 66 Pa. St. 411; *Campbell* v. *City of Kansas,* 102 Mo. 326, 344, 13 S. W. Rep. 897. By the amendment of March 30, 1859, (56 Ohio Laws, 88,) to section 23 of the Municipal Code of May 3, 1852, councils of cities and villages are given power to pass ordinances to prevent interments of the dead within the corporate limits, and to cause removal of bodies interred in violation thereof. By section 20 of the same they are given power to prevent annoyance or injury within the limits of the corporation from anything dangerous or unhealthy, and to cause any nuisance to be abated. 2 Swan & C. p. 1498, § 20. See, also, pages 1506, 1507, §§ 32, 34. Legislation of this character has been held in the authorities cited above to delegate power to the council to pass an ordinance like

that of the council of Youngstown under consideration. The abandonment of the graveyard was therefore lawful, and reverter followed. A continuance of the use would be in violation of a city ordinance. The use would thus be unlawful, and therefore, in legal contemplation, it would become impossible. According to all the authorities, reverter is a consequence. Nor is there any room for the equitable doctrine of *cy pres* to prevent a reverter on abandonment. A dedication, and especially a common-law dedication, is of the land for a specific use. It is not within the presumed intention of the dedicator that the land is to be sold, and its proceeds devoted to a similar use, if the use of the particular land becomes impossible. No such result could follow from the theory of estoppel *in pais*, on which the doctrine rests. No title is conferred for the purpose of alienation. Indeed, it has been expressly held in this state that, even under a statutory dedication, where by the terms of the statute a title in fee does pass, a court of equity cannot, in the case of land dedicated for a schoolhouse and school purposes, where this use has become impossible, decree a sale, and the investment of the proceeds in a new lot for similar purposes. *Board of Education* v. *Edson*, 18 Ohio St. 226. *A fortiori* will such a power not be exercised where the dedication is to be enjoyed not by force of a grant and change of title, but by force of estoppel. In *Campbell* v. *City of Kansas*, 102 Mo. 326, 346, 13 S. W. Rep. 897, land had been dedicated for a cemetery, and was used as such. Subsequently the city council, by ordinance, vacated the land for graveyard purposes, and ordered the bodies there buried removed. The city then laid off the land as a park, and improved it as such, and in all this the public acquiesced. It was held, in a well-considered opinion, that the land reverted to the original owner on the lawful abandonment of the cemetery as such by the city. It follows that, if defendants' case rests alone on the common-law dedication of John Young, the abandonment by the city of the burying ground, as such, causes a reverter to his heirs, and gives the plaintiff a title, with immediate right to possession.

There remains to consider the quitclaim deed of the plaintiff to the village of Youngstown, which, of course, by its terms, inured to the benefit of the city of Youngstown as successor of the grantee. The declarations of the grantor as to his intention in making the deed are wholly incompetent, whether contained in the contemporaneous writings or in his testimony, and such evidence we entirely disregard. The circumstances which existed in the knowledge of both parties alone are to be considered in construing the language used. In this view, the letters of Hoffman and Tod, in so far as they communicated the situation in respect to the cemetery, the litigation to protect it, and the procurement of the act of the legislature, were competent to show that Young executed, and the village of Youngstown accepted, the deed, with that situation before them. Hoffman's statement in his memorial to the village council as to the effect of the quitclaim deed is incompetent. If Young himself had written the memorial, it could not have been used to aid in the construction of the deed under the principle already stated.

v.51F.no.9—38

Still less is it admissible as Hoffman's statement. Whatever may have been Hoffman's relations to Young in respect to other matters, he was acting, in securing the quitclaim deed from Young, not for Young, but for the plaintiffs in the suit to protect the graveyard. It was as attorney for them that he presented the memorial to council,· and nothing he stated therein was made as Young's agent. The council accepted the deed on his advice, and consented that his relation to the suit against Niblock as attorney for the plaintiffs should continue while it was thereafter being prosecuted in the name of the village. In so far as the memorial acquainted the council with the actual *status* of the suit, the act of the legislature, etc., it was competent to show the facts in the light of which the deed was accepted.

Coming now to consider the surrounding circumstances, it is quite evident that the fancied need for a quitclaim deed was to secure a legal title in some one to bring suit for. trespass on the cemetery grounds against Niblock. It was to make up for the defect in the original dedication, which did not pass the title. It may be true that neither the act of April 3, 1867, nor such a deed, was necessary for this purpose, and that trespass might have been maintained either in the name of the village, by virtue of the twenty-third section of the Municipal Code of 1852, as amended March 30, 1859, (56 Ohio Laws, 88,) or, if not, then in the name of the township trustees, under the act of April 13, 1865, (62 Ohio Laws, 145,) which gave into their charge such public burying grounds as were not in charge of a municipal corporation; but we know that the persons interested were doubtful upon this point, and wished both the act and the deed to make their position impregnable. If Young had given a simple quitclaim deed to the village it would have conveyed all his interest, and vested a fee simple in the village, without regard to his purpose in giving it, for such would be the necessary effect of the words of the deed. No inference from the circumstances could affect its legal purport, or ingraft a limitation which there was no language to import. The grantor, in his deed, however, used a clause not necessary in a simple quitclaim deed, upon the construction of which must turn the decision of this case. He granted and quitclaimed the two lots to the village and its successors, "to be under the authority and control of its proper council and municipal authority, in conformity with the act of the legislature in that behalf." What act of the legislature is here referred to? The subject-matter of the conveyance was a burying ground. The act referred to naturally, therefore, relates to the power of village councils over burying grounds. If the expression here used had been in conformity with the laws "or statutes of Ohio in that behalf," the statutes or laws referred to must be construed to be such laws then in force as conferred upon the council of a village authority and control over burying grounds conveyed in fee to the corporation; that is, those laws defining the power of the council in respect to the land conveyed after the conveyance had taken effect. But the use of the singular—"the act of the legislature of Ohio in that behalf"—shows that some single and particular act was in the mind of the grantor. So

far as I have been able to find, the control and authority to be exercised by village councils over burying grounds owned by the corporation in fee in force when this deed was executed, were to be gathered, not from one act of the legislature, but from several. Section 23 of the Municipal Code, as amended by the act of March 30, 1859, (56 Ohio Laws, 88,) the third and sixth sections of the act of March 17, 1860, (57 Ohio Laws, 46,) the second and third sections of the act of March 17, 1860, (57 Ohio Laws, 44,) and section 2 of the act of March 29, 1867, (64 Ohio Laws, 70, 71,) and possibly other acts, all affected the duties and powers of village councils in regard to cemeteries owned in fee by the corporations. Were there no other acts than these to which the language of the deed could be referred, the singular number of the word "act" would not be significant of anything except a slip by the draughtsman of the deed. But the surrounding circumstances show that there was one act, the passage of which had been especially procured "in that behalf," i. e., for the purpose of defining the authority and control to be exercised by the village council of Youngstown over the very land by this deed conveyed. That act applied to burying grounds which had been actually, but not formally, dedicated by the original owner, and in which, therefore, the public had only an easement. The burying grounds conveyed by this deed were of exactly such an origin. The description of them would seem to have been framed for the purpose of showing that they came within the terms of the act, for they are said to have been designated as a burying ground by John Young, the ancestor of the grantor, on his town plat, and to have been occupied as such for over 50 years. There are three distinct statements in the description as to the actual occupancy of the lots for burial purposes. When we consider, then, that one act of the legislature satisfied the reference in the deed,—by defining the power and control of village councils over burying grounds exactly like the one conveyed,—and that no other single act will precisely correspond to the use of the singular in the words "the act of the legislature," etc.; and when we further consider that the deed was given and this act was passed in the same transaction, so to speak, and that at the time of the execution of the deed the passage of the act and its object were facts fresh in the minds of both parties,—we are brought irresistibly to the conclusion that "the act of the legislature of Ohio in that behalf" was this act, entitled "An act for the protection of certain graveyards and burial grounds," passed April 3, 1867, (64 Ohio Laws, 102.)

It follows that the act must be read into the deed. The clause, "to be under the authority and control of the proper council or municipal authority" of the village, is, in fact, a description of the power of the village itself with respect to the land to be conveyed, for in the view of the grantor the council is to act for the village. The clause may therefore be properly interpreted, with the foregoing aids to its construction, as if it read: "Grant," etc., "to the incorporated village of Youngstown and its successors, [the burying ground described in fee,] with the same power and control over it that is conferred on the village and its council

with respect to this land by the act of April 3, 1867." Now, what were the powers conferred on the village and its council by the act? The subject-matter of the. act was burying grounds in which the public had a mere easement, and nò title. The act attempted to change an easement into a title to land, Doubt as to the power of the legislature to do this was probably what led to the procurement of the quitclaim deed. The deed confers the title which the act purported to convey. The act requires the council to take possession, control, and charge of the ground, and preserve and protect the same; to make such ordinances, sales, and regulations as may be necessary and proper for said purposes, and consistent with the health and welfare of the inhabitants; to institute suits to recover possession of the graveyards; to remove trespassers therefrom, and to recover damages for injuries thereto. The word "sales" is probably a mistake in printing or enrollment; the proper word in that connection being "rules." But, taken as it is, it of course refers only to sales of lots in the burying grounds for burial purposes, because the sales are to be such as are necessary for "said purposes," i. e., the possession, control, protection, and preservation of the burying grounds. It could not have been the intention of the legislature to transfer the beneficial interest of the owner in fee of the burial ground to the village so as to permit an alienation of the land. It would have been entirely beyond its power. Le Clercq v. Gallipolis, 7 Ohio, 217; Board of Education v. Edson, 18 Ohio St. 221. The act, properly construed, therefore, only confers upon the village the powers and control over the burying ground which the public would have in such ground dedicated for burial purposes at common law. It fixes the trustee to preserve the rights of the public in a common-law dedication. The authority and control of council is limited by the act to the preservation of such rights, and by reading the act into the deed the same limitation upon the fee therein conveyed is created. This conclusion cannot be escaped. We have already discussed the limits of the right of the public in an easement dedicated at common law, and have found that on a lawful abandonment of the specific use for which the dedication was made there is a reverter to the dedicator and his heirs. No reason can be given why the same result must not follow, when, as here, the naked title in fee is added to the easement. The right of beneficial enjoyment is not thereby increased. The fee, then, is what is called a "qualified," "base," or "determinable" fee, the title reverting on the abandonment of the use, during the continuance of which, though perpetual, the fee would have remained vested. The effect of the deed here was to put the parties in exactly the same situation that they would have been in, had the dedication of John Young, in 1802, been in accordance with the statute then in force. Since the territorial act of 1800 for recording town plats, (1 Chase, St. p. 291,) down to section 2604 of the Revised Statutes,—see Act Feb. 14, 1805, § 2, (1 Chase, St. p. 502,) and Act March 3, 1831, (3 Chase, St. p. 1846,)—a statutory dedication has been deemed "a sufficient conveyance to vest the fee of such parcels as are therein expressed, named, or intended to be for public uses in the county in which such town lies, in trust to and for

the uses and purposes therein named, expressed, or intended, and for no other use or purpose whatever." This is to say that a statutory dedication shall be a naked legal title, with the same beneficial interest enjoyed by the public in an easement by common-law dedication. As we have seen, the quitclaim deed effects exactly this result. The statutory dedication, just like the deed, operates by way of grant, and not by estoppel; but the effect of abandonment of the use is the same as if the fee had not passed. The fee is a base fee, reverting to the grantor on a failure of the use. The supreme court of Ohio has authoritatively settled what effect upon a statutory dedication abandonment of the use has. In *Board of Education* v. *Edson,* 18 Ohio St. 221, the owner of a fee dedicated a lot under the statute "for school purposes, and on which to erect schoolhouses." By the location and use of a railroad and station the lot upon which a schoolhouse had been built became unsuitable for school purposes, and a petition was filed asking the court to decree the sale of the lot and the use of the proceeds for the purchase of a better site. This application, the supreme court held, must be denied. The court say, (page 226:)

"Without determining whether, under the dedication, the lots could be properly used for school purposes other than the erection of schoolhouses thereon, it is enough to say that the dedication is of the land, and not of its value or proceeds. It confers no power of alienation discharged of the use by which the purpose of the dedication might be utterly defeated. Should the sole uses to which the property has been dedicated become impossible of execution, the property would revert to the dedicators or their representatives. *Williams* v. *Society,* 1 Ohio St. 478, (per THURMAN, J.;) *Le Clercq* v. *Gallipolis, supra,* (per LANE, J.)"

Exactly the same principle is enforced in *Zinc Co.* v. *La Salle,* 117 Ill. 411, 8 N. E. Rep. 81, and *Gebhardt* v. *Reeves,* 75 Ill. 301, under a statutory dedication which passed the fee by way of grant. The court here said the fee was a base or determinable fee, reverting on abandonment of the use. See, also, *Hooker* v. *Utica, etc., Turnpike Road Co.,* 12 Wend. 371.

Counsel for the defendants contend that there is a distinction between a grant by deed and a dedication for a particular or specific use, and that a condition subsequent cannot be created in a deed by limiting the use, unless there be a clause of re-entry for forfeiture; and several strong cases are cited to sustain the claim with respect to a deed. *Raley* v. *Umatilla Co.,* 15 Or. 180, 13 Pac. Rep. 890; *Packard* v. *Ames,* 16 Gray, 327; *Ayer* v. *Emery,* 14 Allen, 67; *Brown* v. *Caldwell,* 23 W. Va. 187; *First M. E. Church* v. *Old Columbia Public Ground Co.,* 103 Pa. St. 608. In *Taylor* v. *Binford,* 37 Ohio St. 262, the supreme court of Ohio declined to decide whether the law of Ohio was in accordance with these authorities, and the question is an open one in this state. But these cases do not apply in the construction of the deed at bar. Here the conveyance is in fee to the village to exercise certain defined possession and control over the land, namely, that possession and control exercised by the public over an easement acquired by common-law dedication.

The fee reverts, not by entry after condition broken, but by a simple termination of the estate on the impossibility of exercising the possession and control for which it was given. The case of *Slegel* v. *Herline*, decided by the supreme court of Pennsylvania, (23 Atl. Rep. 996,) is very like the one at bar. In that case a deed was made to county commissioners and their successors for a strip of land adjoining a prison lot and wall, "reserving unto the grantor, his heirs and assigns, the free use of the premises so granted for an open yard, garden, or grass lot, with the rents, issues, and profits, to hold unto the said commissioners and their successors, for the use that it shall remain forever unbuilt on, in order to prevent prisoners making their escape over the said prison wall by means of any building to be erected contiguous to said wall." This was held to pass a fee to the county commissioners, but from the express declaration of purpose there was held to arise a necessary implication of the exclusion of every other purpose, which made the fee a base or qualified fee requiring a reverter to the grantor on abandonment of the prison by the commissioners. The supreme court of Pennsylvania renders no opinion, but simply approves the learned opinion of Judge ENDLICH in the court below. In this case the distinction is pointed out between those authorities which hold that the mere expression of a purpose does not debase a fee and those in which the language is of a character, either in terms or by necessary implication, to constitute such a reservation of the grant as to debase it. He says:

"The qualification must be found in the instrument itself. *Union Canal Co.* v. *Young,* 1 Whart. 410; *Kerlin* v. *Campbell,* 15 Pa. St. 500. But no especial or technical words are required to establish it. 2 Amer. Lead. Cas. p. 23. 'The construction of a deed, as to its operation and effect,' says Kent, speaking of this very matter, ' will, after all, depend less upon artificial rules than upon the application of good sense and sound equity to the object and spirit of the contract in the given case.' 4 Kent, Comm. 132. What is needed is that the deed, on its face, contain a reservation, or declare a specific purpose for which the land was conveyed, and from which the reservation may be implied. CATON, J., in *Adams* v. *Logan Co.,* 11 Ill. 336. Of course, the mere expression of a purpose will not, of and by itself, debase a fee."

See, also, *Kirk* v. *King,* 3 Pa. St. 436; *Scheetz* v. *Fitzwater,* 5 Pa. St. 126; *Campbell* v. *City of Kansas,* 102 Mo. 326, 13 S. W. Rep. 897, and cases there cited.

The quitclaim deed of Young, by reading the act of 1867 into the clause limiting the powers of the village council, shows very clearly the intent of the grantor to limit the effect of the grant to the interest enjoyed by the public under his father's dedication, and debases the fee to that extent. It follows that the lawful abandonment of the burying ground by the city council, and the impossibility of further user as such, caused a reverter of the fee to Young, and a judgment of ouster must be entered in his favor against the defendants.

In the action for mesne profits, the plaintiff is, in view of the plea of the statute of limitations, only entitled to recover the rental value of the property from a time four years before the bringing of the action. Sec-

tion 4982, Rev. St. Ohio. The action was begun July 9, 1889. The rental value of lot No. 96 will be fixed at $1,000 a year, and the amount of recovery for which judgment must be entered will be the rental value from July 9, 1885, to the date of entering judgment.